# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

WENDELL L. CRUSE,
           Plaintiff

    vs

DENNIS GIBSON, et al.,
           Defendants

Case No. 1:10-cv-587
Weber, J.
Litkovitz, M.J.

**ORDER AND REPORT AND
RECOMMENDATION**

Plaintiff Wendell L. Cruse, proceeding pro se, brings this action under 42 U.S.C. § 1983 against defendants Dennis Gibson and Russell Bennett. (Doc. 6). Plaintiff asserts that defendants violated his constitutional rights by conducting an illegal search of his residence and selectively enforcing the law against him on the basis of his race. Plaintiff seeks a declaration that defendants' actions violated his constitutional rights; compensatory damages in the amount of $100,000.00 against each defendant jointly and severally; and punitive damages in the amount of $200,000.00 against each defendant. This matter is now before the Court on defendant Gibson's motion for summary judgment (Doc. 31), plaintiff's response in opposition (Doc. 37), and defendant's reply memorandum in support of his motion (Doc. 39); defendant Gibson's motion to deem matters admitted (Doc. 38); defendant Gibson's motion to strike certain statements and exhibits in support of plaintiff's motion for summary judgment (Doc. 41); and plaintiff's motion for leave to file a response to defendant Gibson's reply in support of the motion for summary judgment (Doc. 43) and defendant Gibson's response in opposition (Doc. 44).

## I. Facts

This case arises out of plaintiff's encounter with members of the Chesapeake, Ohio Police

Department on August 30, 2008, at plaintiff's apartment located at 322 East Fourth Avenue, Chesapeake, Ohio. On that date, defendant Gibson responded to a domestic violence call at plaintiff's residence. When Gibson arrived, two women who were later identified as Christina Johnson and Dreama Dean were outside the apartment. Plaintiff had been dating Johnson, and Dean was a friend of Johnson's. (Cruse Depo., pp. 69-73). Johnson was bleeding profusely (Cruse Depo., p. 111) and Gibson described her as "covered in blood." (Gibson Depo., p. 45). Dean had a black eye. (Cruse Depo., p. 108-09). Johnson told Gibson plaintiff had beat her and thrown her into the wall. (Gibson Depo., p. 45; Doc. 35, Exh. 1, Johnson criminal affidavit). According to plaintiff, Johnson was arguing with plaintiff because he wanted her to leave and she injured herself by smashing her fist into a glass picture. (Cruse Depo., pp. 106-07).

Some time passed after Gibson arrived and before plaintiff exited the apartment. (Gibson Depo., p. 20; Cruse Depo., p. 119). When plaintiff came out of the apartment, Gibson placed him in handcuffs and had him sit outside behind his cruiser because of the heat. (Gibson Depo., p. 16). The cruiser was parked directly in front of the apartment. (Cruse Depo., pp. 118-19). Gibson asked plaintiff for permission to search the apartment, but plaintiff refused and told Gibson he could not enter or search his apartment. (Gibson Depo., pp. 7-8; Cruse Depo., p. 121). Gibson stated he would get a warrant if necessary, but instead he obtained permission from Johnson, who told Gibson she lived in the apartment. (Gibson Depo., pp. 8, 25). Gibson testified at his deposition that after he brought plaintiff to the back of the cruiser and while plaintiff was handcuffed, plaintiff gave Johnson his keys to the apartment. (Gibson Depo., pp. 17-20). Plaintiff denies that he gave a key to Johnson but admits Johnson gave a key to Gibson. (Cruse Depo. pp. 119-121).

According to Gibson, he determined that Johnson was a resident of plaintiff's apartment because she stated she lived there and that she had clothing in a dresser in the house.[1] (Gibson Depo., p. 8). Gibson testified that when he went into the house with Johnson to get her clothes, she had clothing in three dresser drawers and a curling iron in the bathroom. (Gibson Depo., p. 23). Plaintiff denied that Johnson lived with him and described her as "transient." (Depo., p. 80). However, he also testified that he had stopped living with Johnson about two weeks before the incident. (Cruse Depo., p. 107). All bills and utilities for the apartment were in plaintiff's name and no one else was on the lease. (Cruse Depo., pp. 81-82, 88).

Gibson used the key Johnson gave him to enter the apartment. (Cruse Depo., pp. 126-27). According to plaintiff, when Gibson entered the apartment, plaintiff was in the back of the cruiser in handcuffs. (Cruse Depo., p. 127). Defendant Bennett also entered the residence and searched the apartment with Gibson. (Gibson Depo., p. 38). Two highway patrol units and a deputy sheriff came to the scene and stayed outside with plaintiff the entire time defendants searched the apartment. (Gibson Depo., p. 42). When he went into the house, Gibson observed what he suspected to be cocaine residue as well as crack pipes lying in plain view on the kitchen table. (Id., p. 13). Gibson accepted Johnson's statement that the drugs and paraphernalia belonged to plaintiff and did not ask her whether she used drugs (Id., p. 26). Gibson did not search either Johnson or Dean. (Id., p. 30).

According to plaintiff, while he was in the back of the police cruiser at the scene, Johnson recanted her story and said that plaintiff had not touched her. (Cruse Depo., pp. 102, 117).

---

[1]Plaintiff's apartment apparently was a house as the parties use the terms "apartment" and "house" interchangeably when referring to plaintiff's residence.

3

Plaintiff testified that Gibson told plaintiff he was taking him to jail anyway and said to plaintiff: "I don't want your kind around here." (Gibson Depo., p. 102).

Johnson and Dean both gave unsworn statements to the police. (Doc. 35, Exh. 1 at 62-64). Dean alleged in her statement that plaintiff took both of the women's money, hit her with a door and punched her, and stole Johnson's car title and other important papers out of Johnson's purse. (*Id*. at 63-64). Johnson alleged that on the date of the incident, plaintiff took her money out of her pocket and beat her by throwing her into the wall, trying to put her head through the window, and choking her. (*Id*. at 62). Johnson and Dean also provided sworn criminal affidavits in which Johnson stated that plaintiff hit her, threw her around the house, and pulled her hair (*Id*. at 61) and Dean stated that plaintiff beat Johnson and gave Dean a black eye when she tried to pull plaintiff off of Johnson. (*Id*. at 59).

Gibson swore out a criminal affidavit stating that when he arrived at the scene he found two white females covered in blood. (*Id*. at 54). In addition, when he went inside to look at the crime scene, he found some crack cocaine and marijuana on the bed on a piece of paper. (*Id*.). Gibson attached a narrative statement to the affidavit. (*Id*. at 52-53). In the narrative statement, Gibson stated as follows: On August 30, 2008, he was dispatched to 404 Fourth Avenue in response to an assault call. When he arrived, he saw two females - Johnson and Dean - covered in blood standing outside of 322 Fourth Avenue. Dean told Gibson that she had come home with her friend, Johnson, and that Johnson's boyfriend - plaintiff - had started beating Johnson and then struck Dean when she tried to intervene, giving Dean black eye. Gibson called for medical treatment and told plaintiff, who was in the house, to come out. When plaintiff refused to come out, Gibson called for backup. Two highway patrol units arrived about ten minutes later. When

4

plaintiff saw them, he came out of the house and Gibson took him into custody and placed him in the back seat of his patrol car.  Gibson took statements and asked plaintiff at that point if they could search his house, and plaintiff immediately said they could not.  Gibson advised plaintiff that he could get a search warrant if he needed to.  He then read plaintiff his Miranda rights and called Police Chief Bennett and told him to come to the scene because he needed his assistance.  After Gibson took a statement from Johnson and confirmed that she lived at the residence, Johnson asked if she could go into the house to get her clothes because she was afraid to stay there.  Gibson said that she could get some clothes later and advised her that he needed her to take him into the house and show him where she was assaulted.  Johnson gave Gibson a key to the house.  He then looked in the mailbox and found a small bag of marijuana.  When Bennett arrived on the scene, Gibson told him he had needed Johnson to take him into the house to show him where she had been assaulted and he told Bennett what he had found.  Gibson and Bennett then entered the house using the key Johnson had provided.  Gibson asked Johnson to show them where she had been assaulted and allowed her to get some clothes.  Each room of the house was splattered with blood, and Gibson took as many pictures as possible.  On a bed, Gibson saw a paper with what appeared to be crack cocaine on it which someone had been smoking and a canister with some residue in it.  He and Bennett then searched the residence for more drugs.  They found a small jewelry box with four crack pipes, two pieces of wire bent and made into tweezers, one razor blade, two screw drivers and one roach clip, and a canister with two crack filters and a straw that appeared to be covered with cocaine.  Following the search, Gibson got plaintiff up off the ground behind his car, where Gibson had him sitting because it was too hot in

the cruiser[2], and placed him in the cruiser.  Gibson found a tube covered with powder cocaine and another crack pipe.  Gibson then took plaintiff to the police station and transported him to jail.  Gibson described Johnson as having been "severely beaten" and he described Dean as having a black eye, some bruises, and a cut over the eye that she did not sustain during the assault.  (*Id.*)

Gibson charged plaintiff with felonious assault, theft, and possession of drug paraphernalia.  (*Id.* at 55-57).  The prosecuting attorney filed criminal complaints against plaintiff for assault, domestic violence and drug possession.  (*Id.* at 58, 60, 70).  The charges were dismissed.  (Cruse Depo., p. 140).

## II.  Motion to deem matters admitted (Doc. 38)

Defendant moves the Court pursuant to Fed. R. Civ. P. 36 to deem admitted the matters included in defendant's Request for Admissions, which defendant served on plaintiff on May 25, 2011 (Doc. 38-1).  Plaintiff has not filed a response to defendant's motion.  However, plaintiff alleges elsewhere that he mailed his responses to the Request for Admission to defendant on June 16, 2011.  (*See* Doc. 43, Plaintiff's motion for leave to file a response to defendant's reply in support of the motion for summary judgment).

Rule 36(a)(3) provides:

> A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney.  A shorter or longer time for responding may be stipulated to under Rule 29 or be ordered by the court.

The Request for Admissions includes a Certificate of Service certifying that defendant

---

[2]Gibson does not state at what point he removed plaintiff from the back seat of the cruiser, where he had originally placed him, and sat him on the ground behind the cruiser.

served the document on plaintiff on May 25, 2011.  (Doc. 38-1).  Counsel for defendant has filed

an affidavit stating that defendant never received plaintiff's answers to the Request for

Admissions.  (Doc. 44, Exh. A, Affidavit of Dawn Fricke).  Plaintiff has not filed a response to

plaintiff's motion to deem matters admitted and has not submitted any documentation to show

that he served written answers or objections to the Request for Admissions within 30 days as

required under Rule 36(a)(3).  Accordingly, defendant's motion to deem matters is granted, and

the matters included in defendant Gibson's Request for Admissions (Doc. 38-1) shall be deemed

admitted.

## III.  Defendant Gibson's motion to strike (Doc. 41)

Defendant moves the Court to strike certain statements plaintiff makes in his

memorandum in opposition to the motion for summary judgment and exhibits he has attached to

his opposing memorandum.  (Doc. 41).  Defendant argues the statements do not conform to the

requirements of Fed. R. Civ. P. 56 and the exhibits were not produced by plaintiff in discovery.

The Court declines to strike any statements included in plaintiff's opposing memorandum

or any evidentiary materials from the record.  Fed. R. Civ. P. 12(f), which governs a motion to

strike, authorizes the Court to strike only "an insufficient defense or any redundant, immaterial,

impertinent, or scandalous matter" from a pleading and does not authorize the Court to strike

matters pertaining to a summary judgment motion from the record.  Insofar as plaintiff has made

unsupported assertions of fact or submitted documents which are not admissible in evidence, the

Court will disregard such statements and documents when deciding the recommended disposition

of the summary judgment motion.

**IV.  Plaintiff's motion for leave to file a response to defendant's reply in support of the motion for summary judgment (Doc. 43)**

Plaintiff moves for leave to file a response to defendant Gibson's reply in support of his motion for summary judgment pursuant to Fed. R. Civ. P. 56(e)(1).  (Doc. 43).  In his memorandum in support of his motion, plaintiff contends that he timely answered defendant's Request for Admissions; he seeks to rely on defendant Gibson's purported admission that Gibson called the prosecutor for a warrant "and was apparently denied," which plaintiff asserts he did not receive until after he filed his opposing memorandum; and plaintiff states that he did not obtain a copy of his rental lease which he attached to his opposing memorandum until after defendant filed his motion for summary judgment, and he took the photographs attached to his memorandum in response to defendant's argument that he had been arrested and removed from the scene.  (*Id*. at 2).

The Court will deny plaintiff's motion in part and grant it in part.  The Court has addressed plaintiff's failure to respond to defendant's Request for Admissions in connection with defendant's motion to deem matters admitted.  (Doc. 38).  Further briefing on this issue is not warranted.  In addition, plaintiff has not shown that it is appropriate for the Court to consider the unauthenticated partial lease agreement and photographs which he addresses in his motion, and further briefing on these matters is not warranted.  However, plaintiff should be granted an opportunity to address defendant's admission, which plaintiff received after he filed his opposing memorandum.  (*See* Doc. 44 at 2).  Plaintiff correctly notes that although defendant Gibson denied at his deposition that he sought to obtain a warrant to enter plaintiff's apartment (Gibson Depo., p. 15), Gibson admitted in response to plaintiff's Request for Admissions that he

8

"contacted the Lawrence County Prosecutor's Office for a warrant to search plaintiff's residence."[3]  (Doc. 44 at 2).  Accordingly, the Court will consider defendant Gibson's admission that he sought a warrant when deciding the recommended disposition of the motion for summary judgment.

## V.  Motion for Summary Judgment (Doc. 31)

### A.  Summary judgment standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)).

In response to a properly supported summary judgment motion, the non-moving party "'is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.'"  *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989) (quoting *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor.  *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).  However, a district court need not view the facts in the light most favorable to the nonmoving

---

[3]Gibson did not admit that his request was denied.  (*Id.*).

party if that party's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

A principal purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex,* 477 U.S. at 323-24. The moving party need not support his motion with evidence disproving the opposing party's claims. Rather, the moving party need only point out there is an absence of evidence supporting such claims. *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996) (citing *Celotex,* 477 U.S. at 325). Nor must the Court search the entire record for material issues of fact. *Street*, 886 F.2d at 1479-80. The Court need only determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

**B. Qualified immunity standard**

Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The Court applies a two-prong test to qualified immunity claims, determining "whether the facts that a plaintiff has . . . shown make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted). The Court may exercise its sound discretion in deciding which of the two prongs of the

qualified immunity analysis should be addressed first in light of the circumstances. *Id.* at 223.

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson*, 483 U.S. at 640). "For qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel (not just suggest or allow to raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Saylor v. Bd. of Educ. of Harlan Cnty., Ky.*, 118 F.3d 507, 515 (6th Cir. 1997) (citation and internal quotation marks omitted).

### B.  42 U.S.C. § 1983 claims

Title 42 U.S.C. § 1983 creates a civil cause of action against a defendant who, while acting under color of state law, deprives another person of the "rights, privileges or immunities secured by the Constitution or laws of the United States." *Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011) (citation omitted).  To state a claim for relief under § 1983, "a plaintiff must allege a violation of a right secured by the federal Constitution or laws and must show that the violation was committed by a person acting under color of state law." *Flanory v. Bonn*, 604 F.3d 249, 253 (6th Cir. 2010) (citations omitted).

Liberally construed, plaintiff's complaint alleges the following violations of plaintiff's federal constitutional rights: (1) plaintiff was subjected to an unreasonable search in violation of the Fourth Amendment; and (2) plaintiff was subjected to racially discriminatory law enforcement in violation of his rights under the equal protection clause of the Fourteenth Amendment.  For the reasons set forth below, the Court finds that summary judgment should be

11

denied in part and granted in part insofar as plaintiff sues defendant Gibson in his individual

capacity, and summary judgment should be granted on the official capacity claims against

defendant Gibson.

### 1. Summary judgment should be granted in favor of defendant Gibson on plaintiff's Fourth Amendment claim.

Plaintiff claims defendant Gibson violated his Fourth Amendment rights by conducting a

warrantless entry and search of his residence without his consent.  Defendant Gibson asserts that

the warrantless search of plaintiff's apartment was not unreasonable because plaintiff's co-tenant,

Christina Johnson, gave her valid consent for the search.

The Fourth Amendment guarantees "that government officials may not subject citizens to

searches or seizures without proper authorization." *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir.

2009).  A warrantless search of an individual's home is considered per se unreasonable and a

violation of the Fourth Amendment unless an established exception applies. *Katz v. United*

*States*, 389 U.S. 347, 357 (1967).  One such exception is consent which is voluntarily given.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

Third parties who have "common authority over or other sufficient relationship to the

premises or effects sought to be inspected" may consent to a search. *United States v. Matlock*,

415 U.S. 164, 171 (1974).  Consent of a third party is valid when the police, at the time of the

entry, reasonably believed the individual possessed common authority over the premises, even if

the individual in fact did not. *Illinois v. Rodriguez*, 497 U.S. 177 (1990). *See also Georgia v.*

*Randolph*, 547 U.S. 103, 122 (2006); *U.S. v. Kimber,* 395 F. App'x 237, 243 (6th Cir. 2010)

(apparent authority exists if the facts available to the officer at the moment would warrant a man

of reasonable caution in believing there was consent from a party that had authority over the premises) (citing *Rodriguez*, 497 U.S. at 188). The police need not "take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent. . . ." *See Randolph*, 547 U.S. at 122 (citing *Rodriguez*, 497 U.S. 177). However, as the Supreme Court in *Rodriguez* explained, law enforcement officers are not always free to accept a person's invitation to enter premises:

> Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises? *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

*Rodriguez*, 497 U.S. at 188-189. Whether the officer had a reasonable basis to conclude that a third party had authority to consent to a search is a question of law. *Kimber*, 395 F. App'x at 245.

The Supreme Court in *Randolph* addressed the issue of whether "one occupant may give law enforcement effective consent to search shared premises, as against a co-tenant who is present and states a refusal to permit the search." *Id.* at 108. The Court held: "[I]n the circumstances here at issue, a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." *Id.* at 106. The circumstances in *Randolph* were that the police asked the defendant, who was present at his house, for permission to search the house after his wife, who was also present, informed the

13

police there were "items of drug evidence" in the house. *Id*. at 107.  The defendant refused to

give consent. *Id*.  The police officer then asked the defendant's wife for consent, which she

readily gave. *Id*.  The Court determined that the case "invite[d] a straightforward application of

the rule that a physically present inhabitant's express refusal of consent to a police search is

dispositive as to him, regardless of the consent of a fellow occupant." *Id*. at 122-23.  The Court

found that the defendant's refusal was clear and there was no evidence of exigent circumstances

which justified the search on grounds independent of his wife's consent. *Id*.

 The Sixth Circuit has recognized that subsequent to *Randolph*, there has been a split of

authority among lower federal courts as to whether an occupant's refusal to grant consent for a

search remains effective if, after the occupant has been taken into police custody and removed

from his residence, a co-tenant with apparent authority gives consent for the search. *See United

States v. Tatman*, 397 F. App'x 152, 166 n.6 (6th Cir. 2010) (citing *United States v. Murphy*, 516

F.3d 1117 (9th Cir. 2008); *United States v. Henderson*, 536 F.3d 776, 783-84 (7th Cir. 2008);

*United States v. Hudspeth*, 518 F.3d 954, 960-61 (8th Cir. 2008) (en banc)).  The Ninth Circuit

has held that the co-tenant's objection, once expressed, remains effective under such

circumstances. *See Murphy*, 516 F.3d at 1124.  The Seventh Circuit in *Henderson*, 536 F.3d 776,

and the Eighth Circuit in *Hudspeth*, 518 F.3d 954, reached the opposite result.

 In *Murphy*, the plaintiff refused to give his consent for a search of the storage units in

which he was staying. *Id*. at 1119-20.  He was then arrested and transported to jail. *Id*.  Later

that afternoon, the individual who rented the units arrived at the scene and consented to a search

of the units. *Id*. at 1120.  The Court held that the rationale in *Randolph* applied to the facts of the

case and that the search violated the plaintiff's Fourth Amendment rights. *Id*. at 1124.  The

14

Court held that "when a co-tenant objects to a search and another party with common authority subsequently gives consent to that search in the absence of the first co-tenant[,] the search is invalid as to the objecting co-tenant." *Id.* The Court determined that the refusal to consent, once given, "remains effective barring some objective manifestation that [the first co-tenant] has changed his position and no longer objects." *Id.* at 1125. The Court concluded:

> It is true that the consent of either co-tenant may be sufficient in the absence of an objection by the other, either because he simply fails to object or because he is not present to do so. Nevertheless, when an objection has been made by either tenant prior to the officers' entry, the search is not valid as to him and no evidence seized may be used against him. Rather, as in this case, in the absence of exigent circumstances, the police must obtain a warrant before conducting the search.

*Id.*

In contrast, the Seventh Circuit in *Henderson* held that if the objecting co-tenant has been arrested and removed from the scene at the time his co-tenant consents to the search, the objection is no longer binding because *Randolph's* physical presence requirement is not satisfied. *Henderson*, 536 F.3d at 783-84. The search in *Henderson* occurred after the police had responded to a domestic abuse call at the defendant's home, encountered the defendant's wife outside the house, and entered the house with a key provided by the couple's teenage son. *Id.* at 777. Once inside, the defendant ordered the police out. *Id.* at 777-78. The officers then arrested the defendant for domestic battery and took him to the police station. *Id.* at 778. After the defendant had been arrested and removed from the scene, his wife signed a consent-to-search form and led the police on a search of the house which uncovered drugs, firearms, and items

indicative of drug dealing.[4]  *Id.*

The Seventh Circuit determined that the wife's consent rendered the warrantless search reasonable under the Fourth Amendment as *Randolph* applies only when the defendant "is both present and objects to the search of his home." *Id.* at 777.  The Seventh Circuit stated that the Supreme Court in *Randolph* "went out of its way to limit its holding to the circumstances of the case: a disputed consent by two then-present residents with authority." *Id.* at 785.  The Court stated it was implementing *Randolph's* holding that unless there are exigent circumstances, "a warrantless search of a home based on a cotenant's consent is unreasonable in the face of a present tenant's express objection." *Id.*  The Seventh Circuit held that once the tenant leaves, "the tenant assumes the risk that a cotenant may allow the police to enter even knowing that the tenant would object or continue to object if present.  Both presence *and* objection by the tenant are required to render a consent search unreasonable as to him. . . ." *Id.* (emphasis in original).  Accordingly, the Court held that once the defendant had been validly arrested and removed from the scene, his objection to the search lost its force, and his wife was free to authorize a search of the home. *Id.*

In *Hudspeth*, 518 F.3d 954, the defendant had refused to give consent for a search of his home after being arrested at his business.  He was subsequently jailed and his wife, who was present at the house, gave her consent for a search of the home.  The Court held that the "physically present" requirement of *Randolph* was not satisfied because the defendant was not

---

[4] The parties disputed whether the defendant's wife told the police she wanted the house searched before the officers entered the house. *Id.* at 785 n.6.  However, the Court found it unnecessary to address this factual dispute given its ultimate decision, finding: "All that matters is that she voluntarily consented after he had been arrested and removed from the scene." *Id.*

"at the door and objecting." *Id.* at 960 (citing *Randolph*, 547 U.S. at 121). Accordingly, the Court determined that the officers did not violate the Fourth Amendment by seeking the consent of the defendant's wife despite the defendant's earlier refusal. *Id.* at 961.

In addition, at least one state court has held that a tenant who has been arrested and placed in a nearby police car is not "physically present" such that his refusal to consent to a search would bar a warrantless search despite consent given by a co-tenant. *See State of Wisconsin v. St. Martin*, 800 N.W.2d 858, 861 (Wisc. 2011). The state Supreme Court in *St. Martin* answered the following question which had been certified to it: "Whether the rule regarding consent to search a shared dwelling in [*Randolph*], which states that a warrantless search cannot be justified when a physically present resident expressly refuses consent, applies where the physically present resident is taken forcibly from his residence by law enforcement officers but remains in close physical proximity to the residence such that the refusal is made directly to law enforcement on the scene?" *Id.* at 860. The Court answered that the rule in *Randolph* does not apply in such a case. *Id.* at 861. The Court found the better approach to be that taken by federal courts that focus on *Randolph's* requirement "for an express objection while the objecting co-tenant is physically present with the police at the dwelling's threshold." *Id.* The Court reasoned that "*Randolph* is to be construed narrowly," and further that the rule stated in *Randolph* did not apply under the circumstances presented there because the defendant, who was in police custody and seated in a nearby police vehicle when he refused consent, "was not physically present at what the United States Supreme Court called the 'threshold colloquy.'" *Id.* at 859, 861 (citing *Randolph*, 547 U.S. at 121). Instead, the *St. Martin* Court found that the case before it closely resembled the facts presented in *Matlock*, 415 U.S. at 179, where the consent

17

given by a co-resident after the defendant was arrested in the front yard of his home and while he was detained in a squad car some distance from the home was upheld as valid. *Id. See also Prophet v. State of Florida*, 970 So.2d 942 (Fla. App. 4 Dist. 2008) (arrestee handcuffed and placed in back of patrol car was not "physically present" for purposes of determining whether his consent to search was required).

Upon a careful review of the evidence of record in light of the cases applying *Randolph*, the Court finds that defendant Gibson should be granted qualified immunity from liability on the Fourth Amendment claim insofar as plaintiff brings suit against Gibson in his individual capacity. At the time of the search giving rise to this lawsuit, it was well-established that absent exigent circumstances, an officer could not conduct a warrantless search of a home over an occupant's express objection based on a co-tenant's consent if the objecting occupant was "physically present" and objecting. *Randolph*, 547 U.S. at 103. However, the law was not clearly settled as to whether an occupant who had been arrested and removed from his house to a location nearby could be considered "physically present" for purposes of applying *Randolph. See Tatman*, 397 F. App'x 166 n.6, and cases cited therein. Accordingly, as explained more fully below, a reasonable officer in defendant Gibson's position would not understand that conducting a search of plaintiff's apartment under the circumstances presented would constitute a violation of plaintiff's Fourth Amendment rights.

First, a reasonable officer could conclude that Johnson had authority to consent to a search of the apartment. Johnson told Gibson that she lived in the apartment. (Gibson Depo., p. 8). Moreover, Johnson asked Gibson if she could go into the house and get her clothes because she was afraid to stay there, and Johnson had clothes in three dresser drawers and a curling iron

18

inside the house.  (*Id.*, pp. 23, 33).  Although plaintiff alleges that he informed Gibson that Johnson did not live with him (Doc. 37 at 8), Johnson's representation that she resided at the apartment and the remaining circumstances were sufficient to warrant a man of reasonable caution in believing Johnson had authority over the premises.  *See Kimber,* 395 F. App'x at 243.  Accordingly, the Court finds as a matter of law that defendant Gibson had a reasonable basis to conclude that Johnson had authority to consent to the search.

Second, the law as it stood at the time of Gibson's search did not clearly provide an answer to the question of whether plaintiff was "physically present" for purposes of applying the *Randolph* rule.  *See Randolph*, 547 U.S. at 120.  The deposition testimony shows that after plaintiff exited the apartment, Gibson handcuffed plaintiff and placed him either behind his car or in the back of the cruiser.  (Gibson Depo., p. 16; Cruse Depo., p. 127).  Gibson asked plaintiff for permission to search the apartment and plaintiff refused.  (Gibson Depo., pp. 7-8; Gibson Narrative Statement, Doc. 35, Exh. 1, p. 52).  Johnson subsequently gave her consent for the search.  (Gibson Narrative Statement, Doc. 35, Exh. 1, p. 53; Gibson Depo., p. 8).  Thus, at the time plaintiff refused consent for the search and Johnson subsequently consented to the search, plaintiff had been arrested and was not in his apartment but was nearby in police custody on the public street.  Whether or not plaintiff was "physically present" at this point in time within the meaning of *Randolph* is simply not clear from the Supreme Court's decision.  The decision provides little guidance as to the meaning of the term "physically present," alternately describing a "present and objecting" co-tenant as "someone who 'is present at the scene and expressly refuses to consent'"; "a physically present co-occupant[ ] [who has] stated [his] refusal to permit entry"; "a co-tenant who is present and states a refusal to permit the search"; "a second occupant

physically present and refusing permission to search"; "a present and objecting co-tenant"; "a co-tenant 'standing at the door and expressly refusing consent'"; "the express refusal of consent by a physically present resident"; "a physically present fellow tenant [who] objects"; "a potential defendant with self-interest in objecting [who] is in fact at the door and objects" as opposed to a "potential objector, nearby but not invited to take part in the threshold colloquy"; and a "fellow occupant on hand" who objects. *See Tatman*, 397 F. App'x at 161 (citing *Randolph*, 547 U.S. at 106, 108, 109, 114, 119, 120, 121).  Moreover, as indicated above, at least some courts have interpreted *Randolph* to mean that an individual who has been arrested and remains close by yet outside the residence to be searched is not "physically present."  *See St. Martin*, 800 N.W.2d at 859, 861 (rule in *Randolph* did not apply there because the defendant, who was in police custody in a police van parked nearby when consent was requested, "was not physically present at . . . the 'threshold colloquy'"); *Prophet*, 970 So.2d 942 (arrestee handcuffed and placed in back of patrol car was not "physically present" for purposes of determining whether his consent to search was required).  Thus, based on the fact that plaintiff had been arrested, he was in police custody, and he was outside the house and on the public street, defendant Gibson could have reasonably determined that plaintiff was not "physically present" for purposes of consent to the search.

For these reasons, a reasonable officer in defendant Gibson's position would not have clearly understood he was violating plaintiff's Fourth Amendment rights by conducting a warrantless search of plaintiff's home over plaintiff's express objection.  To the contrary, defendant Gibson could have reasonably determined in view of the case law applying *Randolph* that once plaintiff had been arrested and was outside the house in police custody, he was not "physically present" and Johnson's consent therefore trumped his objection to the search.  *See*

*Hudspeth,* 518 F.3d 960 ("physically present" requirement of *Randolph* was not satisfied because the defendant was not "at the door and objecting"); *Henderson,* 536 F.3d at 785 (once the defendant had been validly arrested and removed from the scene, his objection to the search lost its force and his wife was free to authorize a search of the home); *St. Martin,* 800 N.W.2d at 859, 861 (defendant in police custody in a police van parked nearby when consent was requested "was not physically present at . . . the 'threshold colloquy'"); *Prophet,* 970 So.2d 942 (arrestee handcuffed and placed in back of patrol car was not "physically present" for purposes of determining whether his consent to search was required). *But see Murphy,* 516 F.3d at 1125 (a refusal to consent, once given, "remains effective barring some objective manifestation that [the first co-tenant] has changed his position and no longer objects"). Accordingly, defendant Gibson should be granted qualified immunity from liability on plaintiff's Fourth Amendment claim brought against him in his individual capacity.

Plaintiff also sues defendant Gibson in his official capacity. A suit against a government officer in his official capacity is considered a suit against the government entity. *See Myers v. Potter,* 422 F.3d 347, 357 (6th Cir. 2005) (citing *Matthews v. Jones,* 35 F.3d 1046, 1049 (6th Cir. 1994). A government entity cannot be held liable under § 1983 based on a theory of respondeat superior. *Monell v. Dept. of Social Servs.,* 436 U.S. 658 (1978). Rather, in order to hold the entity liable, the plaintiff must establish that the execution of a government policy or custom caused or resulted in the deprivation of a constitutionally protected right. *Id.* at 694. Such a showing requires the demonstration of a "direct causal link" between the official action and the deprivation of a federal right, such that through its "*deliberate* conduct" the government body is the "moving force" behind the alleged injury. *Board of County Comm'rs v. Brown,* 520 U.S.

397, 404 (1997) (emphasis in original).  A custom for purposes of liability under *Monell* "must be so permanent and well settled as to constitute a custom or usage with the force of law." *Doe v. Claiborne County, Tenn.,* 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell,* 436 U.S. at 691).

The City of Chesapeake claims it cannot be held liable for defendant Gibson's actions because Gibson did not act pursuant to an official policy or custom of the City of Chesapeake police department to perform warrantless searches of homes absent consent from one of the inhabitants.  Plaintiff contends that it would be premature to dismiss the official capacity claim because of delays effecting service on defendant Police Chief Russell Bennett and in obtaining discovery, including Bennett's deposition.  Plaintiff alleges there is evidence of a custom or policy because "[a]ll the decision makers of city policy were present at plaintiff's residence during the time that the conduct complained of took place," and defendant Bennett personally entered his residence.  (Doc. 37 at 12).

Summary judgment should be granted in favor of the City of Chesapeake on plaintiff's Fourth Amendment claim.  Plaintiff correctly notes that pro se filings are to be liberally construed.  S*ee Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999).  *See also Haines v. Kerner*, 404 U.S. 519, 520 (1972).  However, plaintiff did not make any allegation in the complaint that defendant Gibson acted pursuant to an official custom or policy of the police department (Doc. 6), and plaintiff has not cited any record evidence in response to defendant's summary judgment motion to show that the police department had a policy or custom of performing invalid searches without consent.  To the contrary, plaintiff concedes that he has been unable to ascertain whether such a policy was in place.  (Doc. 37 at 11).  This is despite the fact that the Court granted plaintiff a 30-day extension of the discovery deadline to October 1, 2011, to obtain any additional

22

necessary discovery. (Doc. 28). Plaintiff has therefore failed to carry his burden on summary judgment to "present some significant probative evidence" which makes it necessary to resolve whether the City of Chesapeake police department had a policy or custom of conducting warrantless searches without valid consent. *See Harris*, 873 F.2d at 931. Absent any evidence of a policy or custom which caused or resulted in the deprivation of plaintiff's Fourth Amendment rights, summary judgment should be granted on plaintiff's Fourth Amendment claim brought against defendant Gibson in his official capacity.

### 2. Fourteenth Amendment claim

Plaintiff alleges in the complaint that defendant Gibson violated his Fourteenth Amendment right to equal protection of the law by telling plaintiff he did not want "his kind" living in Chesapeake, Ohio and that he was going to do anything he could to get plaintiff out of Chesapeake. (Doc. 6 at 3). Defendant acknowledges the targeting of a criminal suspect solely because of his race violates the equal protection clause of the Fourteenth Amendment. (Doc. 31 at 9). However, defendant argues that plaintiff has not satisfied the three-part test for showing that a violation occurred. (*Id*. at 10-11, citing *Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000)). Plaintiff contends there is evidence defendant Gibson selectively enforced the law against plaintiff, an African-American, while choosing not to enforce the law against a Caucasian individual, Christina Johnson, because of plaintiff's race. (Doc. 37 at 10).

It is well-established that "the Fourteenth Amendment protects citizens from police action . . . based solely on impermissible racial considerations." *United States v. Avery*, 137 F.3d 343, 353 (6th Cir. 1997). This protection extends to selective enforcement of the laws. *See Cunningham v. Sisk*, 136 F. App'x 771, 774 (6th Cir. 2005). The protection from

constitutionally unequal treatment afforded by the equal protection clause of the Fourteenth

Amendment exists independently of the Fourth Amendment's protection against unreasonable

searches and seizures. *Id.* Thus, the existence of probable cause for an arrest does not

necessarily dispose of an equal protection claim which alleges selective enforcement. *Id.* (citing

*Avery*, 137 F.3d at 352). Instead, a plaintiff can establish a Fourteenth Amendment violation

based on selective enforcement if he can show "purposeful discrimination" in the officer's

"otherwise valid enforcement of the [] laws against him." *Id.* (citing *Gardenhire*, 205 F.3d at

319).

A claim of selective enforcement is appropriately analyzed under a three-part test which

has been formulated in the context of a claim of selective prosecution. *Id.* (citing *U.S. v.*

*Anderson*, 923 F.2d 450, 453 (6th Cir. 1991)). The plaintiff must show that (1) the officer

singled out a person belonging to an identifiable group even though the officer has decided not to

take action against individuals not belonging to that group in similar situations; (2) the officer

took action against the individual with a discriminatory purpose; and (3) the action must have

had a discriminatory effect on the group to which the individual belongs. *Id.* at 775 (citing

*Anderson*, 923 F.2d at 453).

The evidence presented on summary judgment, viewed in the light most favorable to

plaintiff, is sufficient to satisfy the three-part test for an equal protection violation based on

selective enforcement of the law by defendant Gibson. Gibson testified that he believed Johnson

was a co-habitant of plaintiff's apartment. (Gibson Depo., p. 8). Nonetheless, upon discovering

suspected drugs and drug paraphernalia in the apartment that Gibson believed plaintiff and

Johnson shared, Gibson chose not to search Johnson or to otherwise conduct any investigation

into whether the drugs and paraphernalia might belong to Johnson. (Gibson Depo., pp. 26, 30). Instead, Gibson decided to charge only plaintiff, even though he conceded he could have charged Johnson and had the discretion to do so. (Gibson Depo., pp. 29-30). Gibson testified that he charged only plaintiff based on his demeanor and the way plaintiff was acting and Gibson's belief that the items "appeared to be" plaintiff's based on Gibson's "past experience" (Gibson Depo., pp. 28-29). Gibson's dissimilar treatment of plaintiff and Johnson, coupled with Gibson's vague and subjective reasons for choosing to charge only plaintiff (Gibson Depo., pp. 28-29); Gibson's admitted reliance on Johnson's self-serving statement that the items belonged to plaintiff without conducting any further investigation (Gibson Depo., pp. 26, 29); and Gibson's statement that he did not want plaintiff's "kind" around (Cruse Depo., p. 102), are sufficient to raise a question of fact as to whether Gibson acted with a discriminatory motive when deciding to enforce the drug laws against only plaintiff. It is the province of the jury to weigh the evidence presented and the credibility of the witnesses and determine whether defendant Gibson acted with "purposeful discrimination" in choosing to enforce the law against plaintiff based on his race. *See Cunningham*, 136 F. App'x at 774 (citing *Gardenhire*, 205 F.3d at 319).

The Fourteenth Amendment right to be free from selective enforcement of the law based on one's race was clearly established at the time of the incident in question. Accordingly, defendant Gibson is not entitled to qualified immunity on plaintiff's Fourteenth Amendment claim and should not be granted summary judgment on the individual capacity claim on this basis.

For the same reasons stated in connection with plaintiff's Fourth Amendment claim against defendant Gibson in his official capacity, summary judgment should be granted on

25

plaintiff's Fourteenth Amendment claim brought against defendant Gibson in his official capacity.  Plaintiff has not cited any record evidence in response to defendant's summary judgment motion to show that Gibson acted pursuant to an official custom or policy of the Chesapeake police department.  Instead, plaintiff concedes that he has been unable to ascertain whether such a policy was in place.  (Doc. 37 at 11).  Plaintiff has therefore failed to carry his burden on summary judgment on his Fourteenth Amendment official capacity claim.

## VI. Conclusion

Construing the undisputed evidence in plaintiff's favor, the Court finds that defendant Gibson should be granted qualified immunity on plaintiff's Fourth Amendment claim against him in his individual capacity.  The Court's role is not to determine which of the many courts applying *Randolph* has the better understanding of the case, but rather whether the contours of the right set forth in *Randolph* were so clearly established that a reasonable officer in defendant Gibson's position would have understood that a warrantless search of plaintiff's home over his express objection in the face of apparent consent by his co-tenant constituted a violation of plaintiff's Fourth Amendment rights.  As explained above, the Court finds that the law was not sufficiently clear as demonstrated by the varying results reached by the courts that have examined the validity of a co-tenant's consent given after a co-tenant has expressly refused consent for a search.

Defendant Gibson should not be granted qualified immunity on defendant's Fourteenth Amendment claim against him in his individual capacity because plaintiff has come forward with sufficient evidence to create genuine issues for trial as to whether defendant Gibson's enforcement of the drug laws against him violated his Fourteenth Amendment rights, and the law

26

governing this claim was clearly established as of the date of the alleged violation.

Finally, summary judgment is warranted insofar as plaintiff sues defendant Gibson in his official capacity because plaintiff has failed to come forward with evidence of an official custom or policy that resulted in the violation of his constitutional rights by defendant Gibson.

### IT IS THEREFORE ORDERED THAT:

Defendant Gibson's motion to deem matters admitted (Doc. 38) is **GRANTED**. Defendant Gibson's motion to strike (Doc. 41) is **DENIED**. Plaintiff's motion for leave to file a response to defendant's reply in support of the motion for summary judgment (Doc. 43) is **GRANTED** in part and **DENIED** in part.

### IT IS THEREFORE RECOMMENDED THAT:

Defendant's motion for summary judgment (Doc. 31) be **GRANTED** as to plaintiff's Fourth Amendment claim against defendant Gibson in his individual and official capacities and as to plaintiff's Fourteenth Amendment claim against defendant Gibson in his official capacity, and **DENIED** with respect to plaintiff's Fourteenth Amendment claim against defendant Gibson in his individual capacity.

Date: 4/5/12

Karen L. Litkovitz
United States Magistrate Judge

27

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

WENDELL L. CRUSE,                                   Case No. 1:10-cv-587
            Plaintiff
                                                    Weber, J.
    vs                                              Litkovitz, M.J.

DENNIS GIBSON, et al.,
            Defendants

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

28

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete Item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☑ Agent ☐ Addressee

B. Received by (*Printed Name*)  C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

Wendell L. Cruse
2037 8th Ave.
Huntington, WV 25701

3. Service Type
☑ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*) ☐ Yes

2. Article Number
(*Transfer from service label*)

7003 2260 0002 6723 4699

PS Form 3811, February 2004  Domestic Return Receipt  102595-02-M-1540